### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### WACO DIVISION

**ASHLEY BARNER and SHAWN
ROEBUCK, on behalf of
MCLANE COMPANY, INC.
PROFIT SHARING PLAN,**

      **Plaintiffs,**

**v.**                                                                                 **Case No.: 6:23-00301**

**MCLANE COMPANY, INC.,**

      **Defendant.**

_____/

### CLASS ACTION COMPLAINT

### INTRODUCTION

Ashley Barner and Shawn Roebuck (collectively, "Plaintiffs") have invested their retirement savings in the McLane Company, Inc. Profit Sharing Plan (the "Plan."). McLane Company, Inc. ("McLane") is a fiduciary to the Plan. Its fiduciary obligations to the Plan are the highest known to law. McLane has a duty to protect the retirement savings of Plan participants. Unfortunately, McLane has been asleep at the wheel. McLane allows third parties to charge the Plan millions of dollars in excessive fees and compensation. The excessive fees are paid by Plan participants and reduce the value of Plan participant retirement savings. By analogy, if two adjacent gas stations offered the same gasoline for different prices, McLane has chosen the more expensive gasoline for no rational reason. McLane has acted imprudently, causing millions of dollars to be drained from retirement accounts by excessive fees and compensation paid to third parties. McLane should never have allowed this to happen. A prudent fiduciary would never have allowed this to happen.

## SUMMARY OF ALLEGATIONS

1.      This action seeks to protect the retirement savings of more than 27,000 employees of McLane who are participants in the Plan.

2.      McLane has a fiduciary duty to ensure that the compensation paid by the Plan to third parties who provide services to the Plan is reasonable. McLane failed to do so. McLane also has a duty to prudently select and monitor investments offered through the Plan. The Plan is eligible – given its massive size – for favorable pricing on investments. Instead of taking advantage of favorable pricing, McLane caused Plan participants to pay more for investments than what they were eligible for and more than what they should have paid.

4.       Plaintiffs bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce liability under 29 U.S.C. §1109(a) and to restore to the Plan all losses resulting from McLane's breaches of fiduciary duty.

## JURISDICTION AND VENUE

5.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

6.      This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, and where at least one of the alleged breaches took place.

## ERISA

7.      The ERISA fiduciary duty of prudence is among "the highest known to the law" and requires fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As a fiduciary to the Plan,

McLane is obligated to act for the exclusive benefit of the Plan and to ensure that the Plan's expenses are reasonable. *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

8.      "ERISA is a remedial statute designed to protect the interests of plan participants and beneficiaries . . . Courts should not hasten to employ technical rules of pleading and practice to defeat that goal." *Degnan v. Publicker Industries, Inc*., 83 F.3d 27, 30 (1st Cir. 1996). This mandate favors liberal construction of pleadings. *Fitzgerald v. Codex Corp*., 882 F.2d 586, 589 (1st Cir. 1989); *see also Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund*, 933 F. Supp. 1124, 1134 (D. Mass. 1996).

9.      There are fees associated with administering a 401(k) plan. To help the public obtain a better grasp on fees they pay in retirement plans, the Department of Labor passed regulations in 2012 that require plan administrators to disclose fee and expense information to plan participants. However, most plan participants are still in the dark concerning the actual amount of fees they pay. The lack of understanding is not surprising. Often fees are hidden from plain view.

10.      McLane's fiduciary obligations with respect to the Plan are especially important because Plan participants cannot negotiate fees and expenses charged to Plan participants. Plan participants must trust that McLane will prudently do so.

11.      McLane is also responsible for selecting investments and hiring service providers for the plan. These fiduciary decisions dramatically alter the amount of money participants can save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement. *U.S. Dep't of Labor,*

*A Look at 401(k) Plan Fees*, at 1-2 (Aug. 2013). Stated differently, $28.00 out of every $100.00 the employee believed they were saving for retirement was diverted to a service provider.

12.     Accordingly, McLane must engage in a rigorous process to control Plan expenses and ensure that Plan participants pay no more than reasonable fees and expenses. McLane does not play from a position of weakness. Like most industries, more spending power equates to better pricing. In the retirement services industry, a billion-dollar plan has the spending power to obtain the best services at the lowest cost.

13.     Retirement services providers and plan participants engage in a zero-sum game with very real consequences. Each dollar in fees and expenses paid from a participants' retirement account diminishes the amount available for retirement not only by an equal amount, but also by the opportunity cost of the lost future returns on that same money.

14.     And that is why plan sponsors such as McLane play such an important role – their actions (or inactions) directly influence the outcome of the zero-sum game. Simply put, participants' retirement security is directly correlated to the plan fiduciaries effectiveness in minimizing a Plan's fees and expenses.

15.     Plan fiduciaries should understand third party retirement service providers are motivated to maximize fees from plans. Plan fiduciaries must prioritize and act exclusively in the best interests of  a plan and its participants.  When negotiating on behalf of a plan, fiduciaries must negotiate as if their own money was at stake. No differently, when making investment alternatives available to plan participants, fiduciaries must choose as if they are investing for their own retirement. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

## THE PLAN

16.     The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.  It is a defined contribution plan, to which employees contribute to the individual Plan accounts from their paychecks.

17.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

18.     McLane is a statutory fiduciary to the Plan.

19.     Current and former employees of McLane are eligible to participate in the Plan. The Plan provides the primary source of retirement income for many McLane current and former employees.

20.     Defined contribution retirement plans are generally classified as follows: "Micro" plans (<$5 million in assets); "Small" plans ($5 million-<$50 million); "Mid" plans ($50 million-<$200 million); "Large" plans ($200 million-<$1 billion); and "Mega" plans (>$1 billion).

21.     As of December 31, 2021, the Plan had $1,538,244,207 in assets and 27,416 participants with account balances. The Plan qualifies as a "Mega" plan in the 401(k) marketplace.

22.     Instead of leveraging the Plan's tremendous bargaining power to benefit Plan participants, McLane caused the Plan to pay unreasonable and excessive fees to the detriment of the Plan and its participants.

## THE PARTIES

23.      Plaintiff  Ashley Barner is presently a McLane employee.  She is a Plan participant, and is currently invested in, *inter alia*, the following funds: John Hancock Disciplined Value Mid Cap Fund Class A (JVMAX), Emerald Growth Fund Investor Class (FFGRX), MFS mid Cap Growth Fund Class A (OTCAX), American Funds EuroPacific Growth Fund Class A (AEPGX),

MFS New Discovery Value Fund Class R6 (NDVVX), State Street S&P Index NL Series Fund Class N (SVSPX), Metropolitan West Total Return Bond Fund I (MWTIX), and Invesco Stable Value Trust.

24.     Plaintiff Shawn Roebuck is an employee of McLane. He is a Plan participant and is currently invested in John Hancock Disciplined Value Mid Cap Fund Class A (JVMAX), Emerald Growth Fund Investor Class (FFGRX), MFS Mid Cap Growth Fund Class A (OTCAX), American Funds EuroPacific Growth Fund Class A (AEPGX), MFS New Discovery Value Fund Class R6(NDVVX), MFS Value Fund Class A (MEIAX), State Street S&P Index NL Series Fund Class N (SVSPX), Metropolitan West Total Return Bond Fund I (MWTIX), and Invesco Stable Value Trust.

25.     Plaintiffs have statutory standing to bring this action because 29 U.S. §1132(a)(1) allows a plan participant to file a civil action which seeks relief on behalf of a plan. Here, the Plan suffered millions of dollars in losses caused by McLane's fiduciary breaches. Plaintiffs allege that they and Plan participants suffered the same losses resulting from McLane's ERISA violations. All relief in this action sought by Plaintiffs is on behalf of the Plan.

26.     To establish Constitutional standing (or Article III standing), Plaintiffs need only show a concrete and particularized injury flowing from McLane's ERISA fiduciary breaches. Plaintiffs allege their individual accounts in the Plan suffered economic losses because McLane breached its fiduciary duty to the Plan. Thus, Plaintiffs allege concrete and particularized economic injuries. Plaintiffs also have standing because they are seeking injunctive and equitable relief on behalf of the Plan.

27.

## CLASS ACTION ALLEGATIONS

28.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):

> All persons who were participants in or beneficiaries of the Plan, at any time between April 24, 2017, and the present (the "Class Period").

29.     The members of the Class are so numerous that joinder is impractical. According to the Plan's Annual Form 5500 for the year ending 2021, filed with the U.S. Department of Labor, there were 27,416 Plan participants with account balances as of December 31, 2021.

30.     Plaintiffs' claims are typical of Class members' claims. Like other Class members, Plaintiffs participated in the Plan and suffered injuries because of McLane's ERISA fiduciary breaches. McLane treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and Class members' claims arise out of the same conduct, policies, and practices of McLane as alleged herein, and all members of the Class have been similarly affected by McLane's ERISA violations.

31.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether McLane is a fiduciary of the Plan;

B.     Whether McLane breached its fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether McLane failed to prudently monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     Whether McLane caused the Plan to pay excessive fees for investments;

E.     The proper form of equitable and injunctive relief; and

F.     The proper measure of relief.

32.     Plaintiffs will fairly and adequately represent the Class and retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other Class members. Plaintiffs are committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this action as a class action.

33.     This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for McLane. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

34.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because McLane has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## EXCESSIVE RECORDKEEPING FEES

35.     The Plan's recordkeeper is Merrill Lynch, Pierce, Fenner and Smith, Inc. ("Merrill Lynch"). Merrill Lynch receives direct and indirect compensation from the Plan.

36.     Plan administrative services are sometimes called recordkeeping services. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The

recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These administrative services are largely commodities and the market for them is highly competitive.

37.     Nearly all recordkeepers in the marketplace offer the same range of services. Many of the recordkeeping services are provided by recordkeepers at very little cost.

38.     The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, recordkeepers vigorously compete for business by offering the best price.

39.     The cost of providing recordkeeping services depends mainly on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

40.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

41.     Second, make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and so-called "indirect"

compensation through revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants. Additionally, to the extent prudent fiduciaries agree that recordkeepers receive interest or float income from funds transferred into or out of a plan, fiduciaries track and control these amounts as well.

42.     Third, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by similar plans, as well as the recordkeeping rates that are available in the marketplace. This will generally include conducting a request for proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if a plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

43.     As of December 31, 2021, according to the information available in the Defendant's Form 5500, Merrill Lynch receives <u>direct</u> compensation of at least $1,345,534 annually from the Plan, meaning Plan participants pay annually approximately $53 per participant on average in direct fees to Merrill Lynch. This money is taken directly from Plan participants' retirement accounts.

44.     Merrill Lynch also receives <u>indirect</u> compensation. Merrill Lynch receives indirect compensation in two material ways. First, Merrill Lynch receives compensation via "float" on Plan participant money. Second, Merrill Lynch receives compensation via a practice known as revenue sharing.

45.     "Float" is money in transit in or out of the Plan. McLane agreed that anytime Plan participants deposit or withdraw money from their individual accounts in the Plan, that money will first pass through a Merrill Lynch clearing account. Plan participant money typically sits in Merrill Lynch's clearing account for at least 2-3 days (often much longer). McLane has agreed any investment returns and/or interest earned on Plan participant money while it is in Merrill Lynch's clearing account shall belong to Merrill Lynch. It is an additional form of compensation – indirect compensation – Merrill Lynch receives from the Plan.

46.     The Plan's Annual Form 5500 for the year ending 2021 shows that in 2021 alone nearly $263,000,000 was transferred into and out of the Plan. Thus, in 2021 alone, Merrill Lynch earned interest and investment related revenue on more than $263,000,0000 while the money was in Merrill Lynch's account.

47.     McLane entered into an agreement where Merrill Lynch obtained the benefit of the of this money without considering the value of benefits Merrill Lynch was providing to the Plan. McLane's imprudence caused the Plan losses. For instance, in 2021, a 1% return on $263,000,000 would have generated $2,630,000 in indirect float compensation for the Plan. McLane imprudently permitted Merrill Lynch to siphon millions of dollars from the Plan, just from this one source of indirect compensation.

48.     The Department of Labor has issued guidance concerning fiduciary duties for payment of compensation via float. The Department of Labor instructs that an ERISA fiduciary

acts imprudently when it allows service providers to receive float compensation, unless plan fiduciaries, substantively understand the arrangement, monitor the compensation received from float, negotiate the amount, and include the compensation in the total mix of compensation service providers receive from plans for providing services to plans. This is a common-sense approach.

49.     In 2002, the Department of Labor issued Field Assistance Bulletin 2002-3 (Nov. 5, 2002), available at http://www.dol.gov/ebsa/regs/fab2002-3.html. Specifically, the bulletin describes what a fiduciary needs "to consider in evaluating the reasonableness of an arrangement under which the service provider will be retaining 'float' and what information [] a service provider [is] required to disclose to plan fiduciaries with respect to such arrangements…" *Id.* at *1. The document then sets out steps that plan fiduciaries and service providers should take to ensure that float practices are adequately disclosed, reviewed, and compensation is reasonable – as required by ERISA.

50.     The document lists three primary duties with respect to float compensation for plan fiduciaries, related to their responsibility for conducting a prudent and competent review of float compensation, and three primary duties for a service provider to a plan, primarily related to fully disclosing to plan fiduciaries how float compensation is to be earned. Specifically, a fiduciary is required to: (1) review comparable providers to determine for whom float is credited, (2) review the circumstances under which float is earned (such as the inclusion of time limits for earning float income), and (3) review sufficient information to evaluate float as part of the total compensation to be paid for the services rendered under the agreement. *Id.* Similarly, a service provider is required to: (1) disclose the specific circumstances under which float compensation is taken and maintained, (2) establish and adhere to time frames with respect to depository and redemptive float, and (3) disclose the rate and manner by which float is earned.

51.     McLane has not tracked, monitored, or negotiated the amount of compensation Merrill Lynch receives from float compensation. McLane never disclosed this compensation to Plan participants either.

52.     There is no disclosure in Defendant's annual Department of Labor Form 5500 documents about compensation Merrill Lynch receives from float. As noted above, Defendant's 2021 5500 disclosure (Defendant has not yet filed its 2022 5500 disclosure), states that Merrill Lynch received direct compensation of $1,345,534 annually from the Plan, meaning Plan participants paid approximately $53 per participant in 2022 to Merrill Lynch. The direct fee is excessive. Defendant's 2022 5500 also makes inconsistent and troubling statements about the fees paid to Merrill Lynch. In the notes to the financial statement for the 2022 5500, Defendant states that Merrill Lynch receives an annual amount for recordkeeping annually from each Plan participant. The 5500 also states that the $40 fee is offset and will be reduced by compensation Merrill Lynch receives from indirect sources from the Plan. But there is no disclosure of any compensation Merrill Lynch received from float. Worse yet, the 5500 states that as of December 31, 2021, Merrill Lynch was supposed to rebate $4.6 million in excessive fees to the Plan and its participants, but the money had not been allocated to Plan participants accounts. There is no legitimate reason why Defendant is allowing Merrill Lynch to collect excessive fees and compensation from Plan participants and retain millions of dollars that ought to be in Plan participants' individual accounts. The Plan's 2022 5500 disclosure evidences ERISA imprudence by Defendant.

53.     The undisclosed, undocumented, and simply ignored indirect compensation that Merrill Lynch receives from float is more than the amount of the disclosed direct compensation that Merrill Lynch pockets from the Plan. To make matters even worse, the Plan's assets have

increased by nearly $500,000,000 during the relevant time period while the number of Plan participants decreased. That means Merrill Lynch's compensation has skyrocketed solely due to an increase in Plan assets while the services its provides to the Plan has decreased.

54.    McLane breached its fiduciary duty of prudence by permitting Merrill Lynch to receive excessive compensation via float.

55.    Merrill Lynch also receives indirect compensation via revenue sharing. In a revenue sharing arrangement, the amount of compensation for recordkeeping services to a plan is not based on the actual value of such services, instead compensation is based on the amount of assets in the plan, or amount of assets in certain investments in the plan.

56.    Revenue sharing, while not a *per se* violation of ERISA, can lead to excessive fees charged to participants if not properly understood, monitored, and capped. If a fiduciary enters into a revenue sharing arrangement, it is to (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, or other fee models that are being used in the marketplace, and (3) ensure the plan pays a reasonable amount of fees.

57.    Self-interested recordkeepers prefer fee agreements that allow them to receive "direct" and "indirect" payments for recordkeeping. Recordkeepers often tout the direct fees they collect as being "reasonable" while they surreptitiously collect more from Plan participants via indirect fees.

58.    Recordkeepers such as Merrill Lynch often construct their services agreement so fees collected are not solely tied to services performed but to the amount of assets in a plan (*i.e.*, float and revenue sharing). As Plan assets increase, fees increase proportionately without the recordkeeper providing any additional services.

59.     Plaintiffs are not making a claim against McLane because it allowed the Plan's recordkeeper to pocket revenue sharing. However, when the revenue sharing compensation is left unchecked, it is the participants who pay the price from their 401(k) accounts. As one commentator noted, "[A]t worst, revenue sharing (one source of indirect fees) is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It is a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." *See* Justin Pritchard, "Revenue Sharing and Invisible Fees."[1]

60.     Plan fiduciaries have an obligation to monitor and control recordkeeping fees to ensure that such fees remain reasonable. *See, e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

61.     Prudent fiduciaries implement processes to prudently manage and control a plan's recordkeeping costs. They must closely monitor the fees being paid by the plan. A prudent

---

[1] Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited April 21, 2023).

fiduciary tracks the demands documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

62.     Additionally, to make an informed evaluation whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and so-called "indirect" compensation through revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

63.     In addition to the millions in annual direct fees Plan participants pay Merrill Lynch, and the millions in float compensation Merrill Lynch pockets, Merrill Lynch also collects fees indirectly via revenue sharing. It appears, (based on the bald statements in the 2022 5500) Merrill Lynch rebates some portion of the revenue sharing it collects, but apparently years after holding on to the money (which is an imprudent arrangement), and the amount of money Merrill Lynch collects from revenue sharing exceeds the amount of direct fees Plan participants pay – thus, illustrating the imprudence of direct fees and revenue sharing in the first instance.

64.     Defendant is causing the Plan to provide Merrill Lynch with excessive compensation. When Merrill Lynch's direct and undisclosed indirect compensation is added to the compensation, Merrill Lynch receives at least $5,600,000 annually from Plan participants, or over $207 per plan participant. And Merrill Lynch's compensation continues to increase as Plan assets

increase. But by any genuine measurement, Merrill Lynch's compensation is excessive and unreasonable.

65.    McLane failed to obtain competitive bids ("RFP") during the Class Period which, in turn, has caused the Plan to overpay for recordkeeping during the entire Class Period.

66.    By going through an RFP process annually, or at least every three years—rather than not at all—a prudent plan fiduciary can review the level of service provided by the recordkeeper and compare fees in the marketplace to those being offered by the current recordkeeper. This also allows the plan fiduciary to negotiate with its current provider for a lower fee and/or move to a new provider to provide the same or better services for a more competitive and reasonable fee.

67.    Plans of similar size pay no more than $25 per year per participant for all recordkeeping fees. Here, the "direct compensation" alone McLane admits is caused the Plan to pay Merrill Lynch was more than what a reasonable fee should have been, when the indirect compensation is factored into the mix – Merrill Lynch's compensation is grossly excessive.

68.    By way of illustration, Fidelity Management and Research Company, aka, Fidelity Investments ("Fidelity") is the nation's largest service providers for retirement plans. Merrill Lynch is not even in the top ten. Fidelity's own retirement plan was recently sued. In that case, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D. Mass. 2020).

69.    Additionally, in the *Moitoso* case Fidelity went on to stipulate as follows:

The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present). *Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2.

70.     The key takeaway from this stipulation by Fidelity is simple: Merrill Lynch provides the same or virtually the same services to the Plan here that Fidelity provides to its plan. And Fidelity admitted in federal court the value of those services ranged from between $14.00 to $17.00 per participant annually. Thus, for McLane to permit Merrill Lynch to charge its Plan in excess of $200.00 per participant annually is blatantly imprudent.

71.     Looking at administrative costs for other plans of a similar size shows that the Plan was paying higher direct fees than its peers too – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees. The chart[2] below analyzes a few well-managed similar plans:

//

//

//

//

//

---

[2] Calculations are based on Form 5500 information filed by the respective plans for fiscal 2021, which are the most recent years for which many plans' Form 5500s are currently available.

| Plan Name | Total # participants w/ account balances | Dollar value of plan assets | Total reported recordkeeping & administrative service costs paid in direct comp. from 5500 | Record-keeping and administrative service costs per-participant basis[3] | Service codes |
|---|---|---|---|---|---|
| **McLane Company Plan** | 27,416 | $1,538,244,207 | $1,454,294 | $53.04 | 15, 52, 59, 60, 62, 63, 72 |
| Rock Holdings & Associated Companies Savings Plan | 30,969 | $1,966,112,254 | $306,766 | $9.90 | 37, 60, 64, 65, 71 |
| Quanta Services, Inc., 401(k) Savings Plan | 18,297 | $1,415,144,215 | $224,323 | $12.26 | 37, 60, 64, 65 |
| Wegmans Retirement Plans | 36,305 | $2,856,163,122 | $147,129 | $4.05 | 37, 60, 64, 65, 71 |

72.     Importantly, the above benchmarking compares only fees paid to the above three plans' recordkeepers only as to direct compensation paid to similar plans' recordkeepers. Thus, Defendant caused its Plan to pay Merrill Lynch excessive fees for basically the same services that the other recordkeepers offered. These examples are illustrative and not exhaustive. Plaintiffs anticipate expert witness reports and expert witness testimony will expand on the benchmarking herein and demonstrate conclusively that the Plan paid excessive and unreasonable fees.

---

[3] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. *See* Instructions for Form 5500 (2021) at pg. 29 (defining each service code), available at https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2021-instructions.pdf.

73.     The Annual Form 5500 Reports from these various plans also demonstrate that, in fact, many of the recordkeeping services offered by Merrill Lynch to the Plan here are/were similar to the above comparator plans. In fact, they are nearly identical, but done for $25 or less, per participant, annually.

74.     For example, the service codes from the 5500 for the McLane Plan from 2021 indicate that Merrill Lynch performed the following discrete activities in 2021 for which it collected fees in the form of direct compensation: recordkeeping and information management fees (code "15"); investment management fees (code "52"); shareholder servicing fees (code "59"); sub-transfer agency fees (code "60"); float revenue (code "62"); distribution 12b-1 fees (code "64");  other investment fees and expenses (code "72").  These services codes explain how and why Merrill Lynch was paid for the recordkeeping and administrative services it performed for the McLane Plan (although nowhere in the document it is disclosed how much in total indirect compensation all of these activities/fees generate for Merrill Lynch.  Those same service codes can also be used to compare plans of similar participant and asset size.

75.     By way of comparison, according to the Form 5500s filed by the Rock Holdings & Associated Companies Savings Plan ("the Rock Holdings Plan") for the year 2021, the Rock Holdings Plan's recordkeeper performed nearly the same services that Merrill Lynch performed for the McLane Plan, but Defendant permitted Merrill Lynch to charge the McLane Plan nearly six times as much.  That means the McLane Plan could have saved millions had Defendant negotiated the same or similar deal with Merrill Lynch that the Rock Holdings Plan got with its recordkeeper over the six-year class period.

76.     Much of the same is true for the other two comparator plans identified above, the Quanta Services, Inc., 401(k) Savings Plan ("Quanta Plan"), and the Wegmans Retirement Plans.

77.     The only real substantive difference is that the Defendant from this case caused the McLane Plan to pay at least $53 in direct compensation annually per participant for the services, whereas the Quanta Plan paid only $12.26 annually per participant.  Over six years, the difference amounts to the McLane Plan paying millions more than the Quanta Plan paid for basically the same recordkeeping and administrative services.

78.     The same is also true for the other comparator plan, Wegmans Retirement Plans. The plans are of similar size in terms of assets and participants. Not only that, a comparison of the services codes found in the two plans' Form 5500s demonstrates that the recordkeeping and administrative services work Merrill Lynch did for the McLane Plan were very similar to the recordkeeping and administrative work done by the Wegmans Retirement Plan's recordkeeper. However, Defendant caused the McLane Plan's participants to pay more than eleven (11) times what the Wegmans Retirement Plan paid for the same work performed for the same-sized plan.

79.     Simply put, each of the above plans are comparable because the plans are of similar size in both participants and assets and, more importantly, because the recordkeepers performed similar services for each plan. Thus, based on the comparator plans, if the McLane Plan were a standalone plan, with over 27,000 participants and over $1.5 billion in assets under management in 2021, Defendant should have been able to negotiate a total recordkeeping fee of $25 per year, per participant, at most, from the beginning of the Class Period to the present.

80.     As demonstrated by these benchmarks, considering that the recordkeeping services provided by Merrill Lynch in this case were and remain similar to those provided by all national recordkeepers, Defendant's decision to cause the Plan and its participants to pay $40, or $53 in direct compensation to Merrill Lynch during the Class Period, is both imprudent and in violation of ERISA.

81.     Based on the above table of comparator plans of approximately equivalent size and assets, Defendant should have been able to negotiate a **_total_** recordkeeping cost anywhere from $5 per participant to $25 from the beginning of the Class Period to the present. Instead, Plan participants are paying Merrill Lynch in excess of $200 annually via direct and indirect forms of compensation.

82.     In sum, given the size of the Plan's assets during the class period and total number of participants, in addition to the general trend towards lower administrative expenses in the marketplace, Defendant could have obtained for the Plan administrative services that were comparable to or superior to the typical services provided by Merrill Lynch at a lower cost. Defendant failed to do so and, as a result, violated its fiduciary duties under ERISA.

### EXCESSIVE INVESTMENT RELATED FEES

83.     In terms of excessive fees, Defendant caused the Plan to pay in violation of its fiduciary duties under ERISA, there's more. Much more. Typically, within each mutual fund, there are different share classes. Each share class pays a different "expense" to invest in the exact same mutual fund.

84.     Retirement plans with more spending power have access to the best (lowest priced) share classes, and participants should pay the lowest expense ratios.

85.     McLane failed to select the lowest priced share classes for the Plan. Instead of making the less expensive share classes available as investment options in the Plan, McLane selected relatively *expensive* share classes for the Plan. Plaintiffs estimate that McLane's imprudent choices as to share classes resulted in millions of dollars in excessive fees paid by the Plan and its participants.

86.     A prudent fiduciary must conduct its own independent evaluation to determine which investments may be prudently included in the plan's menu of options. If a fiduciary fails to select prudent investments or fails to remove an imprudent investment from a plan within a reasonable time, as McLane has done here, it is a breach of ERISA's fiduciary duty. *Hughes v. Nw. Univ.*, 211 L. Ed. 2d 558, 142 S. Ct. 737, 742 (2022).

87.     From 2016 through February 2023, the Plan included "expensive" share classes, imprudent by any standard. As such, McLane breach its fiduciary duty.

88.     Long before *Hughes*, the Supreme Court reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 575 U.S. 523. In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act ("UPIA"), treatises, and seminal decisions confirming the duty.

89.     The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets...." *Tibble*, 575 U.S. 523 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id*. § 2 comment.

90.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious

management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

91.     Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

92.     In several instances during the Class Period, McLane failed to prudently monitor the Plan to determine whether the Plan was invested in the prudent and lowest-cost share class available for the Plan's mutual funds.

93.     To be clear, Plaintiffs are not alleging McLane made imprudent choices as between two different funds based on performance. Plaintiffs allege McLane made an imprudent choice by guaranteeing participants a lower return in the investment by having the more *expensive* share classes on its investment menu. Indisputably, participant returns would be higher if the participants had access to the better (less expensive) share classes offered by the identical funds. *Forman v. TriHealth, Inc.*, 40 F.4th 443, 451 (6th Cir. 2022)

94.     In every instance, the two share classes will produce the same initial returns. However, in the more expensive share class, the higher expense ratio erodes gains proportionately

and steepens any losses. The spread between the two share classes grows each year, as the only variable is the expense ratio.

95.     Expense ratios and fees have a profound effect on investment performance.

96.     During the Class Period, McLane failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for each mutual fund on the investment menu.

97.     Not surprisingly, the Plan's mutual fund menu contained some of the most expensive share classes available, including several Merrill Lynch funds, as reflected in the chart below:

| Fund in Plan | Net Expense Ratio | Maximum Sales Charge (Load) | Lower Cost Share Class of Same Fund | Net Expense Ratio | Maximum Sales Charge (Load) | |
|---|---|---|---|---|---|---|
| MFS Mid Cap Growth Fund Class A (OTCAX) | 1.03 | 5.75% | MFS Mid Cap Growth Fund R6 (OTCKX) | .66% | 0 | |
| MFS Value Fund Class A (MEIKX) | .80% | 5.75% | MFS Value Fund Class R6 (MEIKX) | .43% | 0 | |
| John Hancock Disciplined Value Mid Cap Class A (JVMAX) | 1.10% | 5.0% | John Hancock Disciplined Value Mid Cap Class R6 (JVMRX) | .75% | 0 | |
| Emerald Growth Fund Investor Class (FFGRX) | 1.08 | NA | Emerald Growth Fund Institutional Class (FGROX) | .73% | NA | |
| American Funds EuroPacific Growth Fund Class A (AEPGX) | .80 | 5.75% | American Funds EuroPacific Growth Fund Class R6(RERGX) | .46% | 0 | |

| Fund in Plan | Net Expense Ratio | Maximum Sales Charge (Load) | Lower Cost Share Class of Same Fund | Net Expense Ratio | Maximum Sales Charge (Load) | |
|---|---|---|---|---|---|---|
| Metropolitan West Total Return Bond Fund I (MWTIX) | .44% | NA | Metropolitan West Total Return Bond Fund P (MWTSX) | .36% | NA | |

98.     The expense ratios for each share class are not excessive *per se*. However, in this case, the expenses are excessive to Plaintiffs and plan participants because lower cost share classes were available in the *identical* funds.

99.     As illustrated above, the funds offered by the Plan were more expensive than the same funds available to the Plan.

100.     There is no justifiable explanation for McLane's decision to offer the Class A share classes when the R6 share classes were available. More specifically, McLane cannot justify why the Plan's participants were paying significantly more out of their retirement funds to be in Class A shares when McLane had access to R6 share classes or other less expensive share classes.

101.     McLane acted imprudently by keeping the more expensive share classes funds on the Plan investment menu, when the less expensive R6 class was available.  The imprudent process and decisions resulted in a significant waste of retirement savings for the Plan and its participants, including the Plaintiffs and other Plan participants.

102.     Identifying lower cost share classes is not a difficult endeavor. Every mutual fund publishes a prospectus disclosing the different share classes within each fund and applicable fees and expense ratios.

103.     A prudent fiduciary conducting an impartial review of the Plan's investments on a monthly, quarterly, or at least an annual basis, would have easily identified the prudent share

classes available and transferred the Plan's investments in the above-referenced funds into lower-cost prudent shares at the earliest opportunity. Yet, despite the availability of lower-cost shares, McLane failed to do so, breaching its fiduciary duties.

104.    There is no good-faith explanation for utilizing a high-cost share class when a lower-cost share class is available for the exact same investment. The Plan did not receive any additional services nor benefits based on its selection of more expensive share classes; the only consequence was higher costs for Plan participants.

105.    Even if Defendant was to assert the additional revenue earned by Merrill Lynch on the more expensive share classes was ultimately rebated to offset expenses, it would not justify the selection of higher-cost funds. Plan participants are paying more than they should for identical funds. Merrill Lynch is already receiving excessive compensation. And it appears, based on statements in the Plan's 2022 5500, that Merrill Lynch is holding onto the money that ought to be rebated to Plan participants to its benefit and to the detriment of the Plan.

106.    It would make no difference if the excess fees were returned to the Plan or participants in full.  The Plan has allowed Merrill Lynch to create a "collect-now, pay later" scheme wherein it obtains the benefit of the use of the excess fees it charges at no cost. The cost is borne by Plan participants, as that money isn't invested for retirement or is an interest-free loan to Merrill Lynch.

107.    Plaintiffs do not allege McLane had a duty to select different mutual funds. However, Plaintiffs are alleging the Plan *should* have identified the lower cost share classes for each fund on the investment menu. McLane's failure to identify less expensive share classes has wasted the plan's assets and participants' retirement funds. This is a classic breach of ERISA's fiduciary duty of prudence.

## FIRST CLAIM FOR RELIEF
### *Breach of Fiduciary Duty of Prudence*

108.    Plaintiffs re-allege and incorporate herein by reference all previous Paragraphs of this Complaint as if fully set forth herein.

109.    As a fiduciary of the Plan, McLane was and remains subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

110.    McLane breached these fiduciary duties in multiple respects as discussed throughout this Complaint. McLane failed to monitor or control the excessive compensation paid for recordkeeping services, which included float revenue retained by Merrill Lynch. Additionally, McLane did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and as to what was in the best interest of Plan participants as prudent fiduciary acting with the skill, diligence and in a like capacity (administering $1 billion or retirement assets).

111.    Instead, McLane selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.

112.    McLane also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan and failed to act within a reasonable time to remove funds that should have been replaced with lower-cost share class funds.

113.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had McLane complied with their fiduciary obligations, the Plan would not have suffered

these losses, and Plan participants would have had more money available to them for their retirement

114.     Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), McLane is liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for McLane's breaches as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all Plan participants, respectfully request that the Court:

1.     Find and declare that the McLane breached its fiduciary duties as described above;

2.      Find and adjudge that McLane is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.     Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.     Order McLane to provide all accountings necessary to determine the amounts McLane must make good to the Plan under §1109(a);

5.     Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.     Surcharge against McLane and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7.     Reform the Plan to obtain bids for recordkeeping and to pay only reasonable

recordkeeping expenses;

8. Certify the Class, appoint the Plaintiffs as class representatives, and appoint the undersigned as Class Counsel;

9. Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

10. Order the payment of interest to the extent it is allowed by law; and

11. Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 24th day of April, 2023.

Respectfully submitted,

**PAUL M. BOTROS**
Texas Bar. No.: 24040548
**MORGAN & MORGAN, P.A**.
8151 Peters Road Suite 4000
Plantation, FL 33324
Telephone: (954) 318-0268
Fax: (954) 327-3017
Email: Pbotros@forthepeople.com

**MARC R. EDELMAN, ESQ.** (*pro hac vice forthcoming*)
Fla. Bar No. 0096342
**MORGAN & MORGAN, P.A.**
201 N. Franklin Street, Suite 700
Tampa, Florida 33602
Telephone: (813) 577-4722
Fax: (813) 257-0572
Email: MEdelman@forthepeople.com

**BRANDON J. HILL** (*pro hac vice forthcoming*)
Florida Bar Number: 37061
**LUIS A. CABASSA** (*pro hac vice forthcoming*)
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK** (*pro hac vice forthcoming*)
Florida Bar Number: 0285020
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Telephone: (813) 337-7992

Facsimile: (813) 229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com

**MICHAEL C. MCKAY** (*pro hac vice forthcoming*)
Arizona Bar No. 023354
**MCKAY LAW, LLC**
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mmckay@mckaylaw.us